# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| George G. O'Gorman, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1643 C.D. 2019 |
| | : | SUBMITTED: September 15, 2020 |
| Unemployment Compensation | : | |
| Board of Review, | : | |
| Respondent | : | |

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
                   HONORABLE PATRICIA A. McCULLOUGH, Judge
                   HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                                      FILED:  October 9, 2020

George G. O'Gorman (Claimant) petitions for review of the October 17, 2019 Order of the Unemployment Compensation Board of Review (Board) reversing the decision of a Referee to grant Claimant unemployment compensation (UC) benefits. The Board concluded that Claimant was ineligible for UC benefits under Section 402(e) of the Unemployment Compensation Law (Law)[1] because he was suspended from his employment for willful misconduct.  We affirm the Board's Order.

## Background

Claimant worked as a full-time registered nurse for the Pennsylvania Department of Human Services, North Central Secure Treatment Unit (Employer), from May 29, 2012 through May 31, 2019.  Bd.'s Finding of Fact (F.F.) No. 1;

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e).  Section 402(e) of the Law states that an employee shall be ineligible for UC benefits for any week "[i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work."  43 P.S. § 802(e).

Record (R.) Item No. 2.[2]  Claimant worked at a maximum security residential treatment facility for juveniles between the ages of 12 and 21 who have been in trouble.[3]  Bd.'s F.F. No. 2.  Employer provided training to its employees on professional boundaries and expectations as well as sexual harassment.  *Id.* No. 3.  Employer is also subject to the Commonwealth of Pennsylvania's Management Directive on Sexual Harassment (harassment policy), which provides that touching, patting, and other unnecessary physical contact in the workplace will not be tolerated.  *Id.* No. 4; N.T., 8/22/19, Ex. E-1, at 2.[4]  Claimant received and signed a

_____

[2] The Board made its own findings of fact, which differed from those made by the Referee. We reiterate the Board's findings in this section of the Opinion.

[3] At the hearing before the Referee, Employer's witness explained that "the type of facility we work at, we have basically kids, juveniles, who are aged 12 to 21.  We're a maximum secur[ity] treatment facility, which means these kids have been in trouble[] [and h]ave a lot of trauma [in] their background[s]."  Notes of Testimony (N.T.), 8/22/19, at 4.  In its appeal to the Board, Employer further stated that "North Central Secure Treatment Unit is a [m]aximum [s]ecurity [j]uvenile [d]etention [c]enter that is the last stop before prison for . . . juvenile offenders."  R. Item No. 11.

[4] The harassment policy provides in pertinent part:

*Examples of acts of sexual harassment which shall not be tolerated include, but are not limited to the following*, particularly when they are repeated or part of a general pattern of behavior:

. . . .

**Physical**: Impeding or blocking movements, *touching, patting, pinching, or any other unnecessary or unwanted physical contact*.

N.T., 8/22/19, Ex. E-1, at 2 (emphasis added).  The harassment policy also states "that sexual harassment of employees, applicants for employment, or *clients of or individuals conducting business with or receiving services from the Commonwealth is strictly prohibited* and will not be tolerated."  *Id.* at 1 (emphasis added).

copy of the harassment policy in April 2018. Bd.'s F.F. No. 4; N.T., 8/22/19, Ex. E-2.

On May 31, 2019, an 18-year-old female resident was standing in a "med line" to receive her behavioral health medications and approached Claimant, who was standing behind a half-door. Bd.'s F.F. No. 5; *see* R. Item Nos. 2, 3. While checking to make sure that the resident took her medication, Claimant reached across the half-door, placed his hands on the resident's head and shoulders, shook her head, turned her around, and patted her on the buttocks. Bd.'s F.F. No. 6. This type of contact was not part of Claimant's medical training. *Id.*

On June 1, 2019, Employer suspended Claimant pending an investigation into the incident. *Id.* No. 7. In its suspension notice to Claimant, Employer stated: "The reason for this action is[] that on May 31, 2019 during med[]line you are alleged to have slapped a female resident on [the] buttocks. An investigation will be conducted during the course of this suspension and appropriate action will be taken at its conclusion." R. Item No. 6.

Claimant filed a claim for UC benefits, which the local UC Service Center granted. The Service Center found that Employer suspended Claimant for misconduct on the job. R. Item No. 5. Although the Service Center found that Claimant's actions toward the female resident demonstrated a willful disregard of Employer's interests, it found that Claimant had good cause for his conduct, because he had "zero intent of malice or to violate a [work] policy." *Id.*[5] Therefore, the Service Center granted him UC benefits.

---

[5] On his Internet Initial Claims Form, Claimant stated:

I DID NOT KNOWINGLY VIOLATE ANY RULES OR POLICIES. I TAPPED A FEMALE RESIDENT ON THE BUTTOCKS IN A NON-SEXUAL WAY,

**(Footnote continued on next page…)**

3

Employer appealed to the Referee, who held an evidentiary hearing on August 22, 2019.[6] Claimant appeared *pro se* and testified on his own behalf. Employer presented the testimony of its Nursing Supervisor, Karen Weaver, and its Nurse Manager, Jennifer Hons.

Ms. Weaver testified that she received a report that on May 31, 2019, Claimant had slapped an 18-year-old female resident on the buttocks. N.T., 8/22/19, at 4-5. Ms. Weaver testified that another nurse "informed [her] that dorm staff where the residents reside . . . [had] reported to him that there was an allegation made by the [female] resident that [Claimant] had slapped her in the buttocks the night before." *Id.* at 5. Ms. Weaver investigated the incident by viewing video surveillance footage and taking statements from both the female resident and Claimant. *Id.* at 5-6. According to Ms. Weaver, the video showed Claimant "coming into the resident's personal space, poking her at one point, grabbing onto her head and . . . shaking her head back and forth. Turning her around and then slapping her buttocks as she walked away." *Id.* at 5, 13-15.

Ms. Weaver testified that when she notified Claimant of the misconduct allegation, "he immediately . . . said to [her], I did do it. I slapped [the female resident's] butt." *Id.* at 6. Claimant told Ms. Weaver that he believed the resident

STATING GET OUT OF HERE GOOFBALL AS SHE WALKED AWAY FROM MED[]LINE, WHEN SHE TRIED TO REFUSE HER MEDICATIONS AGAIN. THERE WAS ABSOLUTELY ZERO INTENT OF MALICE OR TO VIOLATE [A] POLICY.

R. Item No. 2 (capitalization in original).

[6] As of the date of the Referee's hearing, Employer's investigation was still pending, and Claimant had not yet been discharged from his employment. Bd.'s F.F. No. 8; N.T., 8/22/19, at 4. However, for purposes of a UC claim, a suspension is considered a discharge for the period of the suspension. R. Item No. 2. It is unclear from the record if or when Claimant was ultimately discharged.

4

"was going to refuse her [medications] and he and the resident were joking around about refusing the meds. [Claimant] said he grabbed her neck or her head and kind of like moved her back and forth and then he slapped her buttocks." *Id.* at 6-7.

Ms. Weaver testified that the day after this conversation, Claimant "called [her] and said[] he remembered exactly what happened. That he tripped, lost his balance and accidentally brushed [the female resident] against her buttock[s] with his hand." *Id.* at 7. When she reviewed the video surveillance footage, however, Ms. Weaver did not see any indication that Claimant had tripped. *Id.* at 8.

Ms. Hons testified that on June 1, 2019, she notified Claimant that he was suspended pending investigation into the incident with the female resident. *Id.* at 9. According to Ms. Hons,

> [Claimant] immediately stated that I'm going to tell you exactly what I told [Ms.] Weaver, I did it. I did it. I slapped her. I shouldn't have done it, but I did it, and he basically reiterated exactly what [Ms. Weaver] told me on the phone. He told me exactly . . . the same story.

*Id.* at 9. Ms. Hons further testified that when the female resident reported the incident to Employer, she "specifically said [that Claimant's] actions made her uncomfortable." *Id.* at 10; *see id.*, Ex. E-3.

Ms. Hons testified that Employer provided training to Claimant on professional boundaries and expectations as well as its sexual harassment policy. N.T., 8/22/19, at 9-10. As part of this training, Employer notified Claimant that he "should remain professional at all times" and maintain "clear boundaries with the resident[s]." *Id.* at 10.[7] Employer also informed Claimant of the need for "[r]espect

---

[7] In a July 2016 supervisory conference, Employer informed Claimant that

**(Footnote continued on next page…)**

5

and consider[ation] while providing nursing care" and the prohibition against "conduct defined as [a] sexual violation or sexual improp[riety] . . . in the course of [the] professional relationship." *Id.*; *see id.*, Ex. E-4. Most recently, Employer reviewed these policies with Claimant in April 2019, approximately one month before the incident at issue. N.T., 8/22/19, at 10-11; *see id.*, Ex. E-3.

The Referee then played the video surveillance footage depicting the incident. While viewing the video, Ms. Hons testified, "[The female resident] does a mouth check with the staff. That's [Claimant] right there. Does a mouth check with [Claimant]. [Claimant] grabs [the resident's] head, purposely turns her and swats her on the behind." N.T., 8/22/19, at 14. Viewing the video footage from a different angle, Ms. Hons testified that "[Claimant] purposely puts his hands on her head, and purposely puts his hand on her shoulder and smacks her on the buttock[s]." *Id.* at 15.

Claimant testified that he has been a registered nurse for 29 years and, before the incident at issue, he had worked for Employer for 7 years without incident. *Id.* at 15-17. Claimant testified that, at the time of the incident, he had been treating the 18-year-old female resident for 5 or 6 months. *Id.* at 18. Claimant further testified:

> [T]he resident in question . . . has a history of refusing medications and the documentation of that is . . . the resident will come and refuse her medications, and then . . . my job, or our job as nurses there is to . . . explain and . . . help the resident understand . . . the need for medications. We're talking about psychiatric medications for behavioral issues on this particular resident, and . . . I would do my best

---

[c]reating clear boundaries is essential to having a productive and healthy relationship with residents and your co-workers. When an employee crosses the professional boundary line, it jeopardizes the integrity and success of the residents we serve, as well as the facility.

N.T., 8/22/19, Ex. E-4.

6

to bring it to their level so they could understand . . . what is there, [what] they need to take, why they're taking it. . . .

. . . .

. . . [I]t's my job and my duty if you will to . . . help these residents, all of them, help them understand the importance of their medications and not only to give the med[ications], but the whole treatment program there. Like . . . talk with their counselor. . . . I feel like, you know in part a life coach there. . . . [W]e got to [sic] give encourage[ment] always. . . . [T]hat's one of my things that I do, and we all do. I mean that's just part of my job.

*Id.* at 16-17.

Claimant then viewed the video surveillance footage and described what was depicted as follows:

[The resident] was joking around with me, and then she comes and she gives me a mouth check. I look the other way to see the next kid is coming and then now look, see, right there. And again, if you go back a little bit, pause. You can see, I'm smiling, the resident's smiling as well. We're both in a happy state of mind because we were both kidding around . . . see there's the . . . [the resident is] pointing to . . . the sunset.

*Id.* at 19. With regard to his physical contact with the resident's buttocks, Claimant testified, "I certainly didn't slap her, and you can see that clearly on the video. A slap would be me more . . . indicative of something aggressive or what have you." *Id.* at 20.

After viewing the video, Claimant testified regarding his physical interaction with the female resident as follows:

I then turned [the resident] as she was done with her med[ications], and I turned her gently. I didn't forcefully shake her, I turned her, and then I tapped or if you want to use the word patted her buttocks and when I did, I said, now get out of here goofball, and she was smiling, I was

7

smiling. There was no sexual intent. There was no willful misconduct. I was encouraging the resident to take her medications. I was happy that she took her medication. . . . Sexual harassment? These words are pretty harsh and obviously the video in my perspective and how I stated it happen certainly doesn't indicate that whatsoever, and forcefully and purposely, I mean I was not trying to hide anything. I knew I was on camera. I knew there was a staff member three feet away from me. You know this wasn't anything that was out of the ordinary. I hug these kids every – well when we have meetings. I mean it's . . . something that's encouraging. Happy, elated, yes. Sexual harassment, . . . willful misconduct, I'm sorry, I – no, that's not who I am, it's not what I did .
. . .

*Id.* at 21-22. According to Claimant, "There was no malintent [sic], no nothing. No sexual intent, no – I was happy the kid took her meds. It's that simple." *Id.* at 22.

On cross-examination, when asked if he believed his physical contact with the female resident was appropriate, Claimant replied:

I think I answered that question earlier, if I could relive that moment, I would, and I would not have "patted her on the buttocks," . . . but you know unfortunately . . . I don't know what's right and wrong anymore. It seems like[] . . . day by day things change, and now it's not appropriate to do that.

*Id.* at 25. Claimant also acknowledged that the video did not support his prior statement to Ms. Weaver that he had lost his balance and accidentally touched the resident's buttocks. *Id.* at 27.[8]

---

[8] Claimant explained the discrepancy between his prior statement to Ms. Weaver about tripping and the video surveillance footage as follows:

[On] Sunday[, June 2, 2019,] I was working in my shop, and I turned around and I nearly tripped – I tripped, and I nearly fell and it was almost like a movie plate in my head, and I remembered to myself, maybe that's what happened. I think that's what happened, and that's what I truly believed happened. I didn't have time to review the video. . . . [T]hat's what my mind truly led me to believe that I nearly

**(Footnote continued on next page…)**

Following the hearing, the Referee affirmed the Service Center's decision to award UC benefits, finding that Claimant's conduct did not constitute willful misconduct under Section 402(e) of the Law. The Referee made the following relevant factual findings:

> 6. The nature of the sexual harassment was [that C]laimant touched or patted the buttocks of an 18-year-old female resident at the North Central Secure Treatment Unit.
>
> 7. The 18-year-old female resident can be seen on the video smiling after the incident.
>
> 8. The 18-year-old female resident had a history of refusing to take the behavioral health medication that was prescribed for her.
>
> 9. [C]laimant considered part of his duties to be a "life coach" and to encourage residents to take their prescribed medications.
>
> 10. [C]laimant had no sexual intent toward the resident.

Ref.'s F.F. Nos. 6-10. Based on these findings, the Referee concluded:

> Although [E]mployer established the existence of a rule or policy regarding sexual harassment, . . . having considered the testimony provided by both parties, including each party's analysis of the video evidence that was presented at hearing, *the [R]eferee finds and concludes that [C]laimant had no intent to engage in any sexual harassment of the 18-year-old female resident . . ., but rather [C]laimant's actions were to encourage the [resident] to continue taking her medication . . . . The [R]eferee further notes that the resident in question was smiling after [C]laimant had touched or briefly patted the resident's butt cheek.*

tripped and that's what happened. It wasn't a lie; it wasn't an excuse. It was what I truly believed.

N.T., 8/22/19, at 27.

9

As such, while the Referee in no way questions the Employer's right to discharge the Claimant from employment, the Referee cannot conclude that the Employer has presented sufficient, competent evidence to meet its burden of proof in establishing the Claimant's discharge from employment was for reasons which rise to the level of willful misconduct in connection with the work. . . .

Ref.'s Order, 8/23/19, at 2-3 (emphasis added).

Employer appealed to the Board, which made its own findings of fact and conclusions of law and reversed the Referee's decision. The Board specifically discredited Claimant's testimony that he and the female resident were "joking around" when he touched her and slapped her buttocks. Based on its review of the record evidence, the Board concluded:

While checking to make sure an 18-year-old female resident took her med[ications], [C]laimant reached across a half-door, placed his hands on the resident's head and shoulders, shook her head, turned her, and patted her on the buttocks. *The Board is unable to condone this conduct under the circumstances. [C]laimant's conduct represents a disregard of the standards of behavior which an employer can rightfully expect of its employees in this setting. [C]laimant's conduct not only runs afoul of the Commonwealth's policy on sexual harassment[,] but was inappropriate from a common-sense point of view.* Even though the video[] entered in[to] evidence[] does not depict a vicious slap on the buttocks, *[C]laimant's patting a female resident in this area was inappropriate. So too was [C]laimant's additional physical contact of placing his hands on the resident's head and shoulders or shaking her head.*

*The Board does not accept [C]laimant's explanations that he was joking around, and that he and the female resident were in a happy state of mind.* As [C]laimant admitted, "if I could relive that moment, I would, and I would not have patted her on the buttocks." Consequently, the Board reverses the Referee's [d]ecision, and determines [C]laimant to be ineligible for benefits under Section 402(e) of the Law.

10

Bd.'s Order, 10/17/19, at 2 (emphasis added).[9] Claimant now petitions this Court for review.[10]

## Analysis

On appeal, Claimant asserts that the Board erred in concluding that he committed willful misconduct because it failed to consider his intent in touching the female resident. Specifically, Claimant argues that there was nothing sexual about his touching of the resident and he was only trying to encourage her to take her medications. Claimant also argues that the Board erred in rejecting his testimony that he was "joking around" when he touched the resident's buttocks and in relying on his admission that if he could relive the moment, he would not have touched her buttocks.

Our Court has defined "willful misconduct" as a wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard of the standards of behavior that the employer has a right to expect of its employees, or negligence indicating an intentional disregard of the employer's interests or of the employee's duties and obligations. *Miller v. Unemployment Comp. Bd. of Review*, 83 A.3d 484, 486-87 (Pa. Cmwlth. 2014). An employer seeking to prove that a claimant committed willful misconduct by violating a work policy "must demonstrate the existence of the policy, its reasonableness, and its violation." *Klampfer v. Unemployment Comp. Bd. of Review*, 182 A.3d 495, 500 (Pa. Cmwlth. 2018). The employer must also show that the employee deliberately violated the

---

[9] Claimant filed a timely request for reconsideration with the Board, which was denied on November 18, 2019. R. Item Nos. 13, 15.

[10] Our scope of review is limited to determining whether the necessary factual findings are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

employer's policy. *Tongel v. Unemployment Comp. Bd. of Review*, 501 A.2d 716, 717 (Pa. Cmwlth. 1985). If the employer satisfies its burden of proof, then "the burden shifts to the claimant to demonstrate good cause for violating the [policy]." *Chester Cmty. Charter Sch. v. Unemployment Comp. Bd. of Review*, 138 A.3d 50, 54 (Pa. Cmwlth. 2016).

Here, Ms. Hons credibly testified that Claimant received training on professional boundaries and expectations and appropriate behavior in the workplace. Bd.'s F.F. No. 3. Moreover, Employer's harassment policy prohibits touching, patting, and other unnecessary physical contact with others in the workplace. *Id.* No. 4; N.T., 8/22/19, Ex. E-1, at 2. The record shows that Claimant received and signed the harassment policy in April 2018, and Employer reviewed the policy again with Claimant as recently as one month before the incident. N.T., 8/22/19, at 10-11 & Exs. E-1, E-3.

Claimant's assertions that he merely "attempted to pat" the female resident to "move [her] along and positively encourage her" and that his "contact with her buttocks was accidental," Claimant's Br. at 8, 11-14, 16-18, are unsupported by the testimony of Employer's witnesses. *See* N.T., 8/22/19, at 6, 8-10. Their testimony was further corroborated by Employer's documentary evidence, including its written notice to Claimant regarding its investigation into the incident, wherein Employer stated:

> While you were giving [the female] resident . . . her medications you touched her hair and face, and then when the resident turned and moved away you slapped the resident on the buttocks. *The resident reported that your actions made her uncomfortable. A review of video [surveillance] confirmed the unnecessary and inappropriate touching of the resident as detailed above to include a slap to her buttocks.*

*Id.*, Ex. E-3 (emphasis added). Moreover, at the hearing, Claimant acknowledged that he intentionally patted or slapped the resident's buttocks, N.T., 8/22/19, at 21, 26,[11] and he admitted that the video did not show that he did so "accidentally" or because he "lost his balance," *id.* at 27.

We conclude, based on the credible evidence of record, that Claimant's intentional slapping or patting of an 18-year-old female resident's buttocks, regardless of whether the touching was sexual in nature, constituted "unnecessary or unwanted physical contact" in violation of Employer's harassment policy. *Id.*, Ex. E-1, at 2.

Even if Claimant had not violated Employer's policy, we conclude that his touching of an 18-year-old female resident's face, shoulders, and buttocks was also a disregard of the standards of behavior that Employer had the right to expect of its employees. Ms. Hons credibly testified that Claimant's physical contact with the female resident violated professional boundaries and standards of conduct for nurses. N.T., 8/22/19, at 9-10 & Ex. E-4.

Because Employer met its burden of proving willful misconduct, the burden shifted to Claimant to establish good cause. Claimant contends that he had good cause to place his hands on the resident's head and shoulders because he was trying to encourage her to take her medications. According to Claimant, he "routinely spoke with the patients and it was normal to offer words of encouragement and to pat someone on the back or shoulder to let them know they had done a good job and were on the right path in their treatment." Claimant's Br. at 7. Claimant also asserts that Employer knowingly permitted Claimant to provide encouragement to the residents. *Id.* at 18. However, while Employer may have permitted Claimant to

---

[11] Claimant testified, "[Y]es, I patted the . . . 18-year-old child on the buttocks. . . . I'm not here to deny that." N.T., 8/22/19, at 26.

positively encourage the juvenile residents in his care, its harassment policy clearly prohibited him from unnecessarily touching them.

Claimant maintains that, with regard to his touching of the resident's buttocks, his "intent was to pat the patient and [he] was not aiming for nor intending to hit her rear end, but as he reached over the counter and door[]way from where he was standing, he inadvertently hit her in this manner." Claimant's Br. at 13-14. However, at the hearing, Claimant admitted that the video surveillance did not support his contention that his touching of her buttocks was accidental. N.T., 8/22/19 at 27. Further, the Board credited the testimony of Employer's witnesses, both of whom testified that, shortly after the incident, Claimant stated that he "did it" and that he "slapped her buttocks." *Id.* at 6, 9; Bd.'s Order, 10/17/19, at 2.

The Board also specifically rejected Claimant's testimony that he was joking around in a playful manner when he slapped the female resident's buttocks. Bd.'s Order, 10/17/19, at 2; *see Guthrie v. Unemployment Comp. Bd. of Review*, 738 A.2d 518, 521 (Pa. Cmwlth. 1999) (stating that the Board is the ultimate factfinder in UC cases and is empowered to resolve conflicts in evidence, determine the weight to be accorded the evidence, and determine the credibility of witnesses).

While we can understand Claimant's desire to be a mentor and to provide encouragement and reassurance to the youth who reside in the facility, some of whom have developed a friendly rapport with Claimant, we agree with the Board that Claimant crossed the nurse-patient line in this case. Claimant's behavior is particularly unsettling because the resident he touched was a teenager of the opposite sex. We agree with the Board that Claimant's physical contact with the head, shoulders, and buttocks of an 18-year-old female resident in his care violated professional boundaries and "not only [ran] afoul of the Commonwealth's policy on

14

sexual harassment[,] but was inappropriate from a common-sense point of view." Bd.'s Order, 10/17/19, at 2; *cf. Stover v. Unemployment Comp. Bd. of Review*, 461 A.2d 906, 907-08 (Pa. Cmwlth. 1983) (concluding that the claimant's act of running his fingers through a female co-worker's hair was a disregard of the standards of behavior that the employer can rightfully expect of its employees). Therefore, we conclude that Claimant failed to establish good cause for his conduct.

### Conclusion

Accordingly, because we conclude that Employer met its burden of proving that Claimant committed disqualifying willful misconduct under Section 402(e) of the Law, we affirm the Board's Order.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

George G. O'Gorman,       :
             Petitioner     :
                            :
      v.                  :   No. 1643 C.D. 2019
                            :
Unemployment Compensation    :
Board of Review,             :
             Respondent   :

## **O R D E R**

AND NOW, this 9th day of October, 2020, the Order of the Unemployment Compensation Board of Review, dated October 17, 2019, is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge